**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| ROBERT BOSCH, LLC<br><br>v.<br><br>WESTPORT FUEL SYSTEMS CANADA INC. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. 2:23-CV-00038-JRG-RSP |

# **CLAIM CONSTRUCTION ORDER**

On April 25, 2025, the Court held a hearing to determine the proper construction of disputed terms in United States Patent Nos. 6,298,829 and 6,575,138. Before the Court is the Opening Claim Construction Brief (Dkt. No. 99) filed by Defendant and Counterclaim Plaintiff Westport Fuel Systems Canada, Inc. ("Westport"). Also before the Court are the Responsive Claim Construction Brief (Dkt. No. 105) filed by Plaintiff and Counterclaim Defendant Robert Bosch, LLC ("Bosch"), Westport's Reply Claim Construction Brief (Dkt. No. 115), the parties' February 1, 2024 Patent Rule 4-3 Joint Claim Construction Statement (Dkt. No. 88), and the parties' April 11, 2025 Patent Rule 4-5(d) Joint Claim Construction Chart (Dkt. No. 116).

Having reviewed the arguments made by the parties at the hearing and in their claim construction briefing, having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this Claim Construction Order. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

Table of Contents

**I. BACKGROUND** .......... **2**
**II. LEGAL PRINCIPLES** .......... **3**
**III. AGREED TERMS** .......... **6**
**IV. DISPUTED TERMS** .......... **6**
A. "valve needle" .......... 7
B. "valve member" .......... 14
C. "lift" .......... 17
D. "interior chamber" .......... 22
E. "fluid passage from said interior chamber to said combustion chamber" .......... 26
**V. CONCLUSION** .......... **29**

# I. BACKGROUND

This is a declaratory judgment action in which Westport alleges infringement of United States Patent Nos. 6,298,829 ("the '829 Patent") and 6,575,138 ("the '138 Patent") (Dkt. No. 99, Exs. 1–2). Westport submits that "[t]he Asserted Patents teach high-pressure, direct-injection fuel injector valves for combustion engines, which are used in diesel engines." Dkt. No. 99 at 2. The parties note that both of the asserted patents have expired.

The '829 Patent, titled "Directly Actuated Injection Valve," issued on October 9, 2001, and bears an earliest priority date of March 9, 2000. The Abstract of the '829 Patent states:

> A directly actuated injection valve comprises a hollow valve housing, a valve needle disposed within the hollow interior, a needle spring, an actuator assembly, and a hydraulic link assembly. The valve needle is movable between a closed position and an open position for governing the flow of fuel into the combustion chamber of an internal combustion engine. The displacement of the valve needle from the closed position is defined as the lift. The a [*sic*] needle spring biases the valve needle in the closed position. The actuator assembly generates an opening force that acts against the needle spring to open the valve. The hydraulic link assembly is interposed between the valve needle and the needle spring and the actuator assembly. The hydraulic link assembly transmits respective closing and opening forces to the valve needle. The hydraulic link preferably comprises a piston disposed within a cylinder that is filled with a hydraulic fluid. The opening and closing forces are transmitted through a thickness of the hydraulic fluid that is

> trapped between the planar surfaces of the piston and the head and base of the hydraulic cylinder. In the preferred embodiment, the thickness of the hydraulic fluid trapped between the piston and cylinder head or base is automatically adjustable in response to changes in the dimensional relationship between components of the injection valve to maintain a desired valve needle lift when the actuator assembly is activated. When the actuator assembly comprises a magnetostrictive or piezoelectric member, the movements of the valve needle can be controlled by the application of a shaped control pulse or waveform to improve the speed of the opening and closing motion of the valve needle, and to reduce the impact of the valve needle on the valve seat upon closing.

The ’138 Patent resulted from a continuation-in-part of the ’829 Patent.

The parties note that the patents-in-suit are also at issue in: *Westport Fuel Systems Canada Inc. v. General Motor*s, LLC, 2:21-cv-00455-JRG-RSP (E.D. Tex.); *Westport Fuel Systems Canada Inc. v. Ford Motor Company*, Case No. 2:21-cv-00453-RWS-RSP (E.D. Tex.); and *Westport Fuel Systems Canada Inc. v. Mercedes-Benz USA, LLC*, 2:21-cv-454-RWS-RSP (E.D. Tex.). Dkt. No. 88 at 2.

The Court granted an unopposed motion to stay the above-captioned case pending *Inter Partes* Review (“IPR”) proceedings by the Patent Trial and Appeal Board (“PTAB”) of the United States Patent and Trademark Office (“PTO”). Dkt. No. 107, Apr. 2, 2024 Order. The PTAB found that none of the challenged claims were unpatentable. Dkt. No. 110, Feb. 18, 2025 Joint Submission.

Shortly before the start of the April 25, 2025 hearing, the Court provided the parties with preliminary constructions of the disputed terms with the aim of focusing the parties’ arguments and facilitating discussion. Those preliminary constructions are noted below within the discussion for each term.

## II. LEGAL PRINCIPLES

“It is a ‘bedrock principle’ of patent law that ‘the claims of a patent define the invention to which the patentee is entitled the right to exclude.’” *Phillips*, 415 F.3d at 1312 (quoting

*Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Claim construction is clearly an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841 (citation omitted). "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the 'evidentiary underpinnings' of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal." *Id.* (citing 517 U.S. 370).

To determine the meaning of the claims, courts start by considering the intrinsic evidence. *See Phillips*, 415 F.3d at 1313; *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *accord Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id.* Other asserted or unasserted claims can aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For

example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (quoting *Markman*, 52 F.3d at 979). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *accord Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id.* The specification may also resolve the meaning of ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325. But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *accord Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc. v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent."). "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been

disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (citations and internal quotation marks omitted). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

## III. AGREED TERMS

The parties submit in their February 1, 2024 P.R. 4-3 Joint Claim Construction Statement that they have not reached any agreed-upon constructions. Dkt. No. 88 at 1.

## IV. DISPUTED TERMS

In their claim construction briefing, the parties organize the disputed terms differently. Rather than attempt to divine an ideal ordering, the Court adopts the ordering used in Plaintiff's opening brief.

**A. "valve needle"**

| **"valve needle"**<br>('829 Patent, Claims 1, 14, 20) | |
|---|---|
| **Westport's Proposed Construction** | **Bosch's Proposed Construction** |
| "a valve component having a cylindrical portion with a sealing end" | "a slender elongated valve component that cooperates with a valve seat to seal or unseal the interior chamber from the combustion chamber" |

Dkt. No. 88, Ex. A at 4; Dkt. No. 99 at 9; Dkt. No. 116, Ex. A at 8.

Shortly before the start of the April 25, 2025 hearing, the Court provided the parties with the following preliminary construction: "a slender elongated valve component that is configured to open inwardly."

(1) The Parties' Positions

Westport argues that this term does not have a commonly understood technical definition, that the meaning is clear from its usage in the claims, and that Defendants' proposals of "a slender elongated valve component" and "cooperates with a valve seat to seal or unseal the interior chamber from the combustion chamber" are not supported by the intrinsic record. Dkt. No. 99 at 9–10. Westport also argues that Bosch's reliance on technical definitions of "needle valve" is improper because the disputed term is "valve needle," not "needle valve." *Id.* at 10–11. Westport also submits that Bosch's own expert has acknowledged that the words "slender" and "elongated," which Bosch uses in its proposed construction, are subjective. *Id.* at 12–13. Further, Westport argues that "the patentees intended to capture a different concept related to direct actuation (one related to the ability to precisely control the valve needle including duration control and lift control) rather than a specific location (to the extent that is even a concept relevant to direct actuation)." *Id.* at 16.

Bosch responds that its proposal as to "cooperat[ing] with a valve seat" is consistent with the claim language and is confirmed by the specification. Dkt. No. 105 at 16–17. Bosch also argues that "[i]n both the '829 patent and everyday parlance, 'needle' has a customary meaning," and "[w]hether the context is sewing, medicine, plumbing, or injection valves, a 'needle' is slender and elongated." *Id.* at 19 (citation omitted). Bosch argues that Westport's proposal is overbroad because, for example, "a manhole cover is a cylindrical portion with a sealing end, but no one would ever describe it as having a needle shape." *Id.* at 20.

Westport replies that "Bosch introduces ambiguity into the claim using lay dictionaries to define what a 'valve needle' is in terms of shape," and "'[v]alve needle' refers to a specific valve component—not a specific shape." Dkt. No. 115 at 8. As to Bosch's proposal of "from the combustion chamber," Westport replies that "[a]n interpretation requiring that the valve needle/member directly seal the interior chamber from the combustion chamber would rewrite the claim in a way that is inconsistent with the preferred embodiment, the claim language, and the specification." *Id.* at 9.

At the April 25, 2025 hearing, Westport reiterated its arguments, such as that "slender" and "elongated" are subjective words and that the specification discloses that a "valve needle" need only be a cylindrical portion having a sealing end.

(2) Analysis

The parties agree that a "valve needle" is a component of a valve. The Background section of the specification discloses, for example:

> Direct injection at high pressures presents several challenges. The use of high pressure fuels for direct injection results in high fuel pressures existing within the injection valve or injector. As a result, the injection valve must typically be strongly seated to avoid leakage of the fuel into the combustion chamber between injection events. The valve is "seated" when the valve is closed, for example, in a needle

> valve, when the sealing surfaces of the *valve needle* and the valve seat are in fluid-tight contact with each other.

’829 Patent at 1:38–46 (emphasis added). The specification also discloses:

> In the preferred embodiment, shown more clearly in the enlarged view of FIG. 3, valve seat 112 is angled to maximize fluid flow following the sealing area (where valve needle 114 contacts valve seat 112). The differential angle between the end surface of valve needle 14 and valve seat 112 is chosen so that the flow area does not decrease as gas moves inward toward the central throat of valve tip 106 that feeds nozzle orifice(s) 100.
>
> Valve Needle
>
> Valve needle 114 is disposed within the interior of the valve body and contacts valve seat 112 to close injection valve 100 by preventing fuel from passing beyond valve seat 112 to nozzle orifice 110.

*Id.* at 8:50–62.

Westport cites disclosure in the Summary section of the specification regarding “a valve needle comprising . . .,” but this disclosure primarily merely restates claim language as a description of “[a] preferred fuel injection valve.” ’829 Patent at 5:46–65; *see id.* at 4:1–10 (similar).

Claims 1, 4, 5, 7, 8, and 9 of the ’829 Patent recite (emphasis added):

> 1. An injection valve for injecting fuel into a combustion chamber of an internal combustion engine, said injection valve comprising:
>
> (a) a valve housing comprising:
> a fuel inlet port;
> an interior chamber fluidly connected to said fuel inlet port;
> a nozzle comprising a nozzle orifice providing a fluid passage from said interior chamber to said combustion chamber;
>
> (b) a *valve needle* disposed within said valve housing wherein said *valve needle* is movable between a closed position at which a sealing end of said *valve needle* contacts a valve seat to fluidly seal said interior chamber from said nozzle orifice, and an open position at which said sealing end of said *valve needle* is spaced apart from said valve seat whereby said interior chamber is fluidly connected with said nozzle orifice, wherein *valve needle* lift equals the distance traveled by said sealing end away from said valve seat;

(c) a needle sp[]ring associated with said *valve needle*, wherein said needle spring applies a closing force to said *valve needle* for biasing said *valve needle* in said closed position;

(d) a[]n actuator assembly associated with said *valve needle*, wherein said actuator assembly may be activated to apply an opening force to said *valve needle* stronger than said closing force, for moving said *valve needle* to said open position; and

(e) a hydraulic link assembly comprising a passive hydraulic link having a hydraulic fluid thickness through which said opening and closing forces are transmitted, whereby said hydraulic fluid acts substantially as a solid with said thickness being substantially constant while said actuator assembly is activated and wherein said thickness of said hydraulic link is adjustable while said actuator is not activated in response to changes in the dimensional relationship between components of said injection valve to maintain a desired *valve needle* lift upon activation of said actuator assembly.

* * *

4. The injection valve of claim 1 wherein said hydraulic link assembly comprises a fluidly sealed hydraulic cylinder that is fluidly sealed from said interior chamber, said hydraulic link assembly comprising a piston and said hydraulic fluid is disposed within said hydraulic cylinder.

5. The injection valve of claim 4 wherein said piston is an integral part of said *valve needle*.

* * *

7. The injection valve of claim 1 wherein said actuator assembly comprises a magnetostrictive member, an electric coil disposed around said magnetostrictive member and a flux tube disposed around said electric coil.

8. The injection valve of claim 7 wherein said actuator assembly is disposed within said interior chamber.

9. The injection valve of claim 8 wherein said actuator assembly is tubular and disposed within an annular space around a cylindrical portion of said *valve needle*.

As for the shape, Westport proposes that a "valve needle" need only have "a cylindrical portion with a sealing end," and Westport cites disclosure of a "poppet-type valve tip":

> In an alternative arrangement (not shown), a *poppet-type valve tip* may be used so that downward movement of the *valve needle* causes it to open.

’829 Patent at 9:7–10 (emphasis added). The ’138 Patent refers to a “poppet valve” as being a type of “outward opening valve.” ’138 Patent at 1:50–54. Westport argues that “[t]he term ‘valve needle’ was selected by the patentees to cover both embodiments” and therefore need not be “slender” and “elongated.” Dkt. No. 99 at 14; *see id.* at 13–15.

But Claim 1 of the ’829 Patent recites a “needle,” not a “member” or “component,” and Westport’s proposal of construing a “needle” as merely a “component” would fail to give effect to the patentee’s choice of the word “needle,” which has particular connotations. *See Phillips*, 415 F.3d at 1312 (“Because the patentee is required to ‘define precisely what his invention is,’ . . . it is ‘unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms.’”) (quoting *White v. Dunbar*, 119 U.S. 47, 52 (1886)).

As for the proper construction, on one hand Bosch’s proposal of “slender” has some support in Bosch’s cited general-purpose dictionary definitions of “needle” in the context of physical structures. *See, e.g.,* Dkt. No. 105, Ex. A, Feb. 1, 2024 Quinlan Decl., Ex. H, *Merriam-Webster’s Collegiate Dictionary* 776 (10th ed. 1996) (setting forth various definitions of “needle” in terms of being “slender”); *Phillips*, 415 F.3d at 1314 (“In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words. In such circumstances, general purpose dictionaries may be helpful.”) (citation omitted).

Indeed, a general-purpose dictionary submitted by Bosch includes a definition directed to the context of a valve: “a slender pointed rod controlling a fine inlet or outlet (as in a valve).” *Id.* This is also consistent with the illustration of “valve needle 114” in Figure 1 of the ’829 Patent.

On the other hand, Westport cites deposition testimony of Bosch's expert that: "I don't think that there's a quantitative measure of slenderness, necessarily. It's more of a subjective feel if I'm looking at the part versus the whole injector design, if we're talking about injectors, to determine whether the valve is slender or not." Dkt. No. 99, Ex. 4, Mar. 1, 2024 Quinlan dep. at 106:25–107:5; *see id.* at 105:21–107:5.

This deposition testimony is not dispositive of the issue, but, on balance, Westport's arguments in its briefing and at the April 25, 2025 hearing are persuasive that the word "slender" lacks sufficient support, particularly in light of the potential subjectivity of the word "slender" as used here.

As to "elongated," however, the specification provides the sort of context to which Bosch's expert referred, *id.*, such as by using the word "elongated" when referring to a valve housing:

> FIGS. 1 through 3 show a preferred embodiment of a directly actuated fuel injection valve 100 for internal combustion engines. Injection valve 100 includes *elongated valve housing 102* that cooperates with valve cap 104 and valve tip 106 to provide a fluidly sealed valve body.

'829 Patent at 8:39–43 (emphasis added). Bosch's expert's testimony regarding "elongated" is understandable in this context. *See* Dkt. No. 99, Ex. 4, Mar. 1, 2024 Quinlan dep. at 107:16–108:12 ("Q. . . . How long does a rod have to be in order to be elongated? A. It would depend on its diameter.").

Finally, to whatever extent Westport is arguing that the word "elongated" would be unclear because it is vague, it is noteworthy that, in the context of an indefiniteness analysis, "mathematical precision is not required." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014).

As for the remainder of Bosch's proposed construction, Bosch proposes that a valve needle "cooperates with a valve seat to seal or unseal the interior chamber from the combustion chamber."

Claim 1 of the '829 Patent (reproduced above) recites that the "valve needle contacts a valve seat to fluidly seal said interior chamber from said nozzle orifice," and the claim recites "a nozzle orifice" as "providing a fluid passage from said interior chamber to said combustion chamber." Bosch's proposal that a valve needle "cooperates with a valve seat to seal or unseal the interior chamber from the combustion chamber" is therefore consistent with context in which "valve needed" is used in the claim.

Westport argues that Bosch's proposed construction would improperly preclude the presence of an intermediate passage, such as a nozzle throat. Dkt. No. 99 at 16 (citing '829 Patent at 13:10–15). No such restriction is apparent in Bosch's proposal of "seal or unseal the interior chamber from the combustion chamber." Indeed, Bosch has responded: "Regardless of whether the valve needle/member opens immediately to the combustion chamber or whether there is an intervening passage or chamber, what matters is that the component 'cooperates with a valve seat to seal or unseal the interior chamber from the combustion chamber.'" Dkt. No. 105 at 18.

Nonetheless, the relationships involving "interior chamber" and "combustion chamber" are already set forth by other claim language, and restating them in the construction of "valve needle" would tend to confuse rather than clarify the scope of the claim. Instead, the construction of "valve needle" should focus on the structure of the valve needle itself, which includes being configured to cooperate with a valve seat so as to seal and unseal.

The Court therefore hereby construes "valve needle" to mean **"an elongated cylindrical valve component that is configured to cooperate with a valve seat so as to seal and unseal."**

**B. "valve member"**

| **"valve member"**<br>('138 Patent, Claims 1, 19, 28) | |
|---|---|
| **Westport's Proposed Construction** | **Bosch's Proposed Construction** |
| "a valve component having a sealing surface that fluidly seals against said valve seat when said injection valve is closed and that is liftable away from said valve seat when said injection valve is open" | "valve component that cooperates with a valve seat to seal or unseal the interior chamber from the combustion chamber" |

Dkt. No. 88, Ex. A at 6; Dkt. No. 99 at 17; Dkt. No. 116, Ex. A at 6.

Shortly before the start of the April 25, 2025 hearing, the Court provided the parties with the following preliminary construction: "a valve component that is configured to cooperate with a valve seat so as to seal and unseal."

(1) The Parties' Positions

Westport argues that "Claims 1, 19 and 28 of the '138 Patent disclose a 'valve member' in the place of the '829 Patent's 'valve needle'" and "many of the same arguments apply." Dkt. No. 99 at 17. Westport also argues that "the claim language sufficiently defines the term and no further construction is needed," and "[t]he claim language is also consistent with the specification." *Id.* at 18. Further, Westport argues that Bosch's proposal would improperly exclude embodiments in which there is a "an intermediate nozzle chamber interposed between the interior chamber and the combustion chamber." *Id.* at 19.

Defendants respond as to this term together with the term "valve needle," which is addressed above. *See* Dkt. No. 105 at 15–22.

Plaintiff replies likewise. *See* Dkt. No. 115 at 7–9.

At the April 25, 2025 hearing, Westport argued that some of the language of the Court's preliminary construction pertained to the valve seat rather than the valve member, but Westport expressed that it was amenable to the Court's preliminary construction. Bosch was likewise amenable to the Court's preliminary construction.

(2) Analysis

The specification discloses:

> Opposed to a needle valve, which employs a needle that is retracted into the valve body to open the valve, an outward opening injection valve extends a valve member outward and away from the valve body to open the valve. To open an outward opening fuel injection valve for injecting fuel into an engine, a valve member is moved away from a valve seat and towards the combustion chamber.
>
> * * *
>
> The enlarged view of FIG. 2 also shows how valve seat 112 is angled to form a cone-shaped surface and cooperates with the angled sealing surface of valve member 114 to provide a fluid tight seal when the two surfaces are pressed into contact. In addition to providing a desirable sealing arrangement, valve seat 112 and the sealing surface of valve member 114 are angled to guide the direction in which the fuel is injected into the combustion chamber.

'138 Patent at 8:63–9:3 & 9:22–29; *see id.* at Fig. 2. The specification also discloses:

> Valve Member
>
> With reference to FIG. 1, valve member 114 is disposed within the interior of valve housing 102 and extends through an opening in the tip of valve housing 102. The sealing surface of valve member 114 contacts valve seat 112 to close injection valve 100 by preventing fuel from passing beyond valve seat 112 and into the combustion chamber. In the embodiment of FIG. 1, valve member 114 comprises valve stem 114a, which moves into the open position by moving outward away from the valve body to lift away from valve seat 112. Since the valve lift is generally small (for example, about 65 micrometers), the diameter of valve stem 114a and the size of the annular opening around valve stem 114a are selected to ensure sufficient flow capacity through the injection valve since flow area (A) is proportional to valve stem diameter. Hence, a small lift can be compensated for by a larger diameter. In the preferred embodiment illustrated by FIG. 1 valve member 114 further comprises an integral piston 114b. In another embodiment (not shown) a separate piston member may cooperate with valve member 114 to provide the same effect.

*Id.* at 9:58–6:11.

Claim 1 of the '138 Patent, for example, recites:

> 1. An injection valve for injecting fuel into a combustion chamber of an internal combustion engine, said injection valve comprising:
> (a) a valve housing comprising:
> a fuel inlet port;
> an interior chamber fluidly connected to said fuel inlet port; and
> *a valve seat for cooperating with a valve member to seal said interior chamber from said combustion chamber when said injection valve is closed;*
> (b) said *valve member* having one end disposed within said valve housing and an opposite end extendable from said valve seat toward said combustion chamber, wherein said *valve member* comprises a sealing surface that fluidly seals against said valve seat when said injection valve is closed and that is liftable away from said valve seat when said injection valve is open;
> (c) a biasing mechanism associated with said *valve member*, said biasing mechanism applying a closing force to said *valve member* when said *valve member* is in said closed position;
> (d) an actuator assembly associated with said *valve member*, wherein said actuator assembly may be actuated to apply an opening force to said *valve member* stronger than said closing force, for moving said *valve member* to said open position; and
> (e) a hydraulic link assembly comprising a passive hydraulic link having a hydraulic fluid thickness through which said opening and closing forces are transmitted, whereby said hydraulic fluid acts substantially as a solid with said thickness being substantially constant while said actuator assembly is actuated and wherein said thickness of said hydraulic link is adjustable while said actuator assembly is not actuated in response to changes in the dimensional relationship between components of said injection valve to maintain a desired valve lift upon actuation of said actuator assembly.

As for Bosch's proposal that a valve member "cooperates with a valve seat to seal or unseal the interior chamber from the combustion chamber," the same analysis applies as is set forth above regarding "valve needle." Also, as noted above, both sides were amenable to the Court's preliminary construction at the April 25, 2025 hearing.

The Court therefore hereby construes "valve member" to mean "**a valve component that is configured to cooperate with a valve seat so as to seal and unseal.**"

**C. "lift"**

| **"lift"**<br>('829 Patent, Claims 1, 11, 12;<br>'138 Patent, Claims 1, 17, 18) | |
|---|---|
| **Westport's Proposed Construction** | **Bosch's Proposed Construction** |
| "the distance traveled by said sealing end away from said valve seat" | "the displacement of the valve [needle ('829 patent) / member ('138 patent)] away from its closed / seated position to its open position" |

Dkt. No. 88, Ex. A at 1; Dkt. No. 99 at 20; Dkt. No. 116, Ex. A at 3.

Shortly before the start of the April 25, 2025 hearing, the Court provided the parties with the following preliminary construction: "displacement of a valve needle (or valve member) away from its closed/seated position to its open position."

(1) The Parties' Positions

Westport argues that "lift" is defined by surrounding claim language and that Bosch improperly attempts to limit the construction to disclosures regarding needle valves. Dkt. No. 99 at 22.

Bosch responds that "[t]he '138 and '829 patents include an express definition of the claim term 'lift.'" Dkt. No. 105 at 11. Bosch submits that this definition should be given effect, particularly because the purportedly novel invention is "the ability to control the amount that the valve is open (its 'lift') rather than merely the duration that it is open (the prior art 'duration control')." *Id.* at 13. Bosch argues that applying the patentee's express definition is further appropriate because the surrounding claim language "does not explain how lift is measured, where the distance begins, or where it ends." *Id.* at 14.

Westport replies that "[n]ot *every* aspect of an invention must be included in *every* claim; in fact, other elements—including, for example, the claimed passive hydraulic link—distinguish

the claimed inventions from the prior art." Dkt. No. 115 at 5 (citation omitted). Westport also argues that whereas Bosch relies on the Background section of the patent, the claim language itself defines "lift." *Id.* at 6.

At the April 25, 2025 hearing, Westport maintained that Claim 1 of the '829 Patent already expressly sets forth a definition for "lift" in that claim. Bosch responded that the Court should apply the lexicography that is expressly set forth in the specification. Westport argued that the purported lexicography in the '829 Patent is limited to "the context of needle valves," and Westport submitted that Bosch's expert agrees that "needle valve" and "valve needle" are *not* synonymous.

(2) Analysis

Claims 1, 6, and 11 of the '829 Patent, for example, recite (emphasis added):

> 1. An injection valve for injecting fuel into a combustion chamber of an internal combustion engine, said injection valve comprising:
>
> (a) a valve housing comprising:
>
> a fuel inlet port;
>
> an interior chamber fluidly connected to said fuel inlet port;
>
> a nozzle comprising a nozzle orifice providing a fluid passage from said interior chamber to said combustion chamber;
>
> (b) a valve needle disposed within said valve housing wherein said valve needle is movable between a closed position at which a sealing end of said valve needle contacts a valve seat to fluidly seal said interior chamber from said nozzle orifice, and an open position at which said sealing end of said valve needle is spaced apart from said valve seat whereby said interior chamber is fluidly connected with said nozzle orifice, *wherein valve needle lift equals the distance traveled by said sealing end away from said valve seat*;
>
> (c) a needle sp[]ring associated with said valve needle, wherein said needle spring applies a closing force to said valve needle for biasing said valve needle in said closed position;
>
> (d) a[]n actuator assembly associated with said valve needle, wherein said actuator assembly may be activated to apply an opening force to said valve needle stronger than said closing force, for moving said valve needle to said open position; and
>
> (e) a hydraulic link assembly comprising a passive hydraulic link having a hydraulic fluid thickness through which said opening and closing forces are transmitted, whereby said hydraulic fluid acts substantially as a solid with said thickness being substantially constant while said actuator assembly is activated and wherein said thickness of said hydraulic link is adjustable while said actuator is not

> activated in response to changes in the dimensional relationship between components of said injection valve to maintain a desired valve needle *lift* upon activation of said actuator assembly.
>
> * * *
>
> 6. The injection valve of claim 1 wherein said actuator assembly comprises a magnetostrictive member or a piezoelectric stack.
>
> * * *
>
> 11. The injection valve of claim 6 wherein when said actuator assembly is controllable to *control said desired lift to between 10 and 100 percent of maximum lift*.

Claim 1 of the '829 Patent expressly recites that "valve needle lift equals the distance traveled by said sealing end away from said valve seat."

The Background section of the '829 Patent states:

> "Lift" in the context of needle valves is *defined herein as* the displacement of the valve needle away from its closed/seated position to its open position.

'829 Patent at 2:21–23 (emphasis added).

The patentee's use of "is defined herein as," as well as the patentee's use of quotation marks around the term "lift," signal that the patentee set forth a definition. *See Sinorgchem Co. v. ITC*, 511 F.3d 1132, 1136 (Fed. Cir. 2008) ("The term 'controlled amount' is set off by quotation marks—often a strong indication that what follows is a definition. Moreover, the word 'is,' again a term used here in the specification, may signify that a patentee is serving as its own lexicographer.") (citations and internal quotation marks omitted).

Westport argues that this definition is not applicable because Claim 1 of the '829 Patent recites "[a]n injection valve," not a "needle valve."

Westport's argument is unpersuasive because the above-reproduced definition refers to displacement of a "valve needle." Because the patentee chose to use the term "valve needle" in

the claims as well as in the above-reproduced definition, the patentee tethered the claims to this explicit definition set forth in the specification.

This is also consistent with the Abstract of the '829 Patent, which likewise "define[s]" "the lift" by using the word "displacement" (and does so without any reference to "the context of needle valves"): "[T]he displacement of the valve needle from the closed position is defined as the lift."

Plaintiff argues that the above-reproduced statement in the specification is inconsistent with dependent claims, such as above-reproduced Claim 11 of the '829 Patent, because that claim recites that the lift is "between 10 and 100 percent of maximum lift," such that the valve can be less than fully "open" (less than 100 percent of maximum lift).

The patentee's use of "open position" in the above-reproduced definition, however, is consistent with allowing for less than 100 percent of maximum lift. In such circumstances, the amount of lift in the "open position" is simply less than the maximum lift. *See, e.g.,* '829 Patent at 4:51–55 ("[T]he actuator assembly is controllable to control the desired lift between 10 and 100 percent of maximum lift. That is, the control pulse directed to the actuator assembly can be modulated to provide full or partial lift, as desired.").

Also, Westport argues that the presence of dependent claims that refer to percentages of maximum lift demonstrate that the independent claims do not require controllable lift. This does not appear to be in dispute, however, because Bosch's proposed construction does not require controllable lift.

Further, the *Sunoco* case cited by Westport is inapposite because Westport does not identify any "direct conflict" between the express definition and the patentee's usage of the term "lift" elsewhere in the patent. *See Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, No. CV 17-1390-LPS-CJB, 2019 WL 4072311, at *4 n.3 (D. Del. Aug. 29, 2019) ("[I]f

language in the 'Background of the Invention' section that describes a term seems like it is in direct conflict with language regarding that term that is found in a section describing the present invention, then there might be reason to credit the latter over the former.").

In sum, there is no ambiguity or inconsistency arising from the patentee's express definition of "lift," and "[w]hen the specification explains and defines a term used in the claims, without ambiguity or incompleteness, there is no need to search further for the meaning of the term." *Sinorgchem*, 511 F.3d at 1138 (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998)). "[T]he inventor's lexigraphy governs." *Phillips*, 415 F.3d at 1316 (citation omitted). The specification defines "lift," and the recital in Claim 1 of the '829 Patent of what lift "equals" is a distinct limitation (with reference to the "sealing end") apart from the patentee's above-discussed lexicography.

Finally, the patentee's lexicography is equally definitive in the Background section of the '138 Patent (perhaps even more so, because the definition in the '138 Patent refers to the "context of injection valves" rather than the "context of needle valves"):

> "Lift" in the context of injection valves is *defined herein as* the displacement of the valve needle or member away from its closed/seated position to its open position.

'138 Patent at 2:48–51 (emphasis added).

The Court therefore hereby construes "lift" to mean **"displacement of a valve needle (or valve member) away from its closed/seated position to its open position."**

**D. "interior chamber"**

| **"interior chamber"**<br>('829 Patent, Claim 1;<br>'138 Patent, Claim 1) | |
|---|---|
| **Westport's Proposed Construction** | **Bosch's Proposed Construction** |
| Plain and ordinary meaning, where if construction is needed plain and ordinary meaning is "a space or compartment inside the injector" | "volume from which high-pressure fuel is injected into the combustion chamber when the valve is actuated" |

Dkt. No. 88, Ex. A at 3; Dkt. No. 99 at 24; Dkt. No. 116, Ex. A at 10.

Shortly before the start of the April 25, 2025 hearing, the Court provided the parties with the following preliminary construction: "Plain and ordinary meaning."

(1) The Parties' Positions

Westport argues that "Bosch proposes to write into the claim a multitude of entirely new requirements based on Bosch's view of the [*sic*] how the invention as a whole works and its non-infringement arguments." Dkt. No. 99 at 24. Westport also submits that Bosch's own expert has been unable to explain how to determine whether a particular amount of pressure is "high-pressure" as set forth in Bosch's proposed construction. *Id.* at 25–26. Further, Westport argues that whereas "the patentees described the interior chamber in purely structural terms," Bosch is attempting to import functional limitations. *Id.* at 27.

Bosch responds that "the claims themselves require that fuel from the interior chamber is injected into the combustion chamber when the valve is actuated," which Bosch argues is also supported by the specification. Dkt. No. 105 at 23–24. Bosch also argues, for example, that its proposal of "high-pressure" is appropriate because the necessary pressure will vary from

implementation to implementation, depending on the combustion chamber pressure in each particular implementation. *Id.* at 24–25.

Westport replies that "Bosch seeks to import requirements related to the operation of the fuel injector, describing how the claimed valve works, rather than its structure." Dkt. No. 115 at 10.

At the April 25, 2025 hearing, Bosch maintained that "high pressure" is a limitation but suggested that the term "interior chamber" does not itself require high pressure. Rather, Bosch suggested, the dispute regarding "high pressure" could be addressed in the context of Westport's infringement contentions.

<u>(2) Analysis</u>

Claim 1 of the '829 Patent, for example, recites (emphasis added):

> 1. An injection valve for injecting fuel into a combustion chamber of an internal combustion engine, said injection valve comprising:
> (a) a valve housing comprising:
> a fuel inlet port;
> an *interior chamber* fluidly connected to said fuel inlet port;
> a nozzle comprising a nozzle orifice providing a fluid passage from said *interior chamber* to said combustion chamber;
> (b) a valve needle disposed within said valve housing wherein said valve needle is movable between a closed position at which a sealing end of said valve needle contacts a valve seat to fluidly seal said *interior chamber* from said nozzle orifice, and an open position at which said sealing end of said valve needle is spaced apart from said valve seat whereby said *interior chamber* is fluidly connected with said nozzle orifice, wherein valve needle lift equals the distance traveled by said sealing end away from said valve seat;
> (c) a needle sp[]ring associated with said valve needle, wherein said needle spring applies a closing force to said valve needle for biasing said valve needle in said closed position;
> (d) a[]n actuator assembly associated with said valve needle, wherein said actuator assembly may be activated to apply an opening force to said valve needle stronger than said closing force, for moving said valve needle to said open position; and
> (e) a hydraulic link assembly comprising a passive hydraulic link having a hydraulic fluid thickness through which said opening and closing forces are transmitted, whereby said hydraulic fluid acts substantially as a solid with said

> thickness being substantially constant while said actuator assembly is activated and wherein said thickness of said hydraulic link is adjustable while said actuator is not activated in response to changes in the dimensional relationship between components of said injection valve to maintain a desired valve needle lift upon activation of said actuator assembly.

The specification discloses:

> The present invention relates generally to high pressure fuel injection valves or injectors for internal combustion engines, and, more specifically, to an injection valve that is directly controllable by a position activating material (such as, for example, a piezoelectric or magnetostrictive material) and which includes a passive hydraulic link.
>
> * * *
>
> The gaseous fuel needs to be injected at high pressure to overcome the combustion chamber pressure, which is high at the end of the compression stroke. Preferably, the injection pressure is high enough to promote good mixing between the injected fuel and the combustion chamber air.
>
> * * *
>
> Valve cap 104 comprises inlet port 108 through which fuel enters the valve body, and valve tip 106 comprises at least one nozzle orifice 110 through which fuel exits the valve body.

’829 Patent at 1:12–17, 1:32–37 & 8:45–48.

Bosch argues that the “interior chamber” must have “high-pressure fuel” in order for the claimed valve to be able to inject fuel into a combustion chamber, but these claims do not recite “pressure.” Adding a limitation so as to exclude embodiments in which the pressure is not high enough to be operable, however, would be improper. *See Network-1 Techs., Inc. v. Hewlett-Packard Co.*, 981 F.3d 1015, 1025 (Fed. Cir. 2020) (“To be sure, we have stated that we skeptically view a construction that renders all embodiments inoperable, but we have instructed that it is nonetheless improper to add limitations to constructions to exclude only certain inoperable embodiments.”) (citation omitted). This is particularly true here, where Bosch’s proposal of “high-pressure” is imprecise and might exclude operable embodiments as well. *See id.*; Dkt. No. 99,

Ex. 4, Mar. 1, 2024 Quinlan dep. at 117:11–119:5 ("[I]t has to be high enough that you can overcome the cylinder pressure inside the combustion chamber and also atomize the spray into small enough droplets that can evaporate quick enough and burn quick enough for the time that you have to do the combustion process. * * * Q. What definition would you give the jury for what high pressure means in your definition of 'interior chamber'? . . . THE WITNESS: Again, I don't think I would give them a definition. If I needed to explain it to them, I would say that it has to be significantly higher than the pressure into which you're injecting, right? Flow goes from high pressure to low pressure, and so if you want to inject fuel into the combustion chamber, the pressure must be higher in the interior chamber.").

Also, dependent Claim 18 of the '829 Patent and dependent Claim 26 of the '138 Patent recite a particular pressure ("2000 psi"), which weighs further against including a pressure limitation in the independent claims. *See Phillips*, 415 F.3d at 1315 ("the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim").

As for Bosch's proposal of a requirement that fuel is injected when the valve is actuated, no such functional or temporal requirement appears in the claims, and Bosch does not persuasively justify importing such a limitation. *The Toro Co. v. White Consol. Indus., Inc.*, 266 F.3d 1367, 1371 (Fed. Cir. 2001) ("An invention claimed in purely structural terms generally resists functional limitation.") (citations omitted). Even assuming that the preamble recital of "[a]n injection valve for injecting fuel into a combustion chamber of an internal combustion engine" is limiting, this recital of "*for* injecting" does not require an active step.

The Court therefore hereby expressly rejects Defendants' proposed construction. As the parties agreed at the April 25, 2025 hearing, however, the "interior chamber" is "interior" in the

sense that it is within the injector. More precisely, in the context in which "interior chamber" is used in the claims, the "interior chamber" is within the recited "valve housing." Construction in this regarding "will assist the jury to understand the claims." *TQP Dev., LLC v. Merrill Lynch & Co.*, No. 2:08-CV-471-WCB, 2012 WL 1940849, at *2 (E.D. Tex. May 29, 2012) (Bryson, J., sitting by designation).

The Court accordingly hereby construes "interior chamber" to mean **"chamber within the valve housing."**

**E. "fluid passage from said interior chamber to said combustion chamber"**

| **"fluid passage from said interior chamber to said combustion chamber"**<br>('829 Patent, Claim 1) | |
|---|---|
| **Westport's Proposed Construction** | **Bosch's Proposed Construction** |
| "a pathway fluidly connecting the interior chamber and the combustion chamber" | "passage for fuel to flow from the interior chamber to the combustion chamber" |

Dkt. No. 88, Ex. A at 8; Dkt. No. 99 at 28; Dkt. No. 116, Ex. A at 1.

Shortly before the start of the April 25, 2025 hearing, the Court provided the parties with the following preliminary construction: "a passage fluidly connecting the interior chamber and the combustion chamber."

(1) The Parties' Positions

Westport argues that "[i]n the context of the asserted claims, which are apparatus claims, 'a fluid passage' should be construed to mean the structural arrangement," and "is simply a pathway that fluidly connects two spaces within the fuel injector." Dkt. No. 99 at 28. Westport argues that the claims include no directionality, and "neither the claims nor the specification require the fuel inlet port to be located in the valve cap." *Id.* at 29–30.

Bosch responds that "the claims resolve the dispute by describing a structure that dictates how fuel will flow through the claimed injector." Dkt. No. 105 at 7. Bosch also argues that "the patent's specification confirms to a POSITA that the claimed 'fluid passage' is one that allows fuel to flow *from* the interior chamber (connected to the fuel inlet port) through the nozzle orifice *to* the combustion chamber." *Id.* at 9 (citation omitted). Bosch submits that "[h]ad the inventors intended to claim a passage through which fuel could flow in either direction, they would have done so by claiming, for example, a fluid passage *between* the interior and combustion chambers." *Id.* at 10.

Westport replies that "Bosch adds a new operational requirement and does not actually interpret any claim language . . .," and "Bosch seeks to interject operational requirements related to how the passage is *used* rather [than] what the passage *is*." Dkt. No. 115 at 2 & 3. Westport argues that "from" and "to" in the claim "indicate the location of the passage structure, not how the passage is used." *Id.* at 4.

At the April 25, 2025 hearing, the parties presented oral arguments as to this term.

<u>(2) Analysis</u>

Claim 1 of the '829 Patent, for example, recites (emphasis added):

> 1. An injection valve for injecting fuel into a combustion chamber of an internal combustion engine, said injection valve comprising:
>
> (a) a valve housing comprising:
> a fuel inlet port;
> an interior chamber fluidly connected to said fuel inlet port;
> a nozzle comprising a nozzle orifice providing a *fluid passage* from said interior chamber to said combustion chamber;
>
> (b) a valve needle disposed within said valve housing wherein said valve needle is movable between a closed position at which a sealing end of said valve needle contacts a valve seat to fluidly seal said interior chamber from said nozzle orifice, and an open position at which said sealing end of said valve needle is spaced apart from said valve seat whereby said interior chamber is fluidly connected with said nozzle orifice, wherein valve needle lift equals the distance traveled by said sealing end away from said valve seat;

> (c) a needle sp[]ring associated with said valve needle, wherein said needle spring applies a closing force to said valve needle for biasing said valve needle in said closed position;
>
> (d) a[]n actuator assembly associated with said valve needle, wherein said actuator assembly may be activated to apply an opening force to said valve needle stronger than said closing force, for moving said valve needle to said open position; and
>
> (e) a hydraulic link assembly comprising a passive hydraulic link having a hydraulic fluid thickness through which said opening and closing forces are transmitted, whereby said hydraulic fluid acts substantially as a solid with said thickness being substantially constant while said actuator assembly is activated and wherein said thickness of said hydraulic link is adjustable while said actuator is not activated in response to changes in the dimensional relationship between components of said injection valve to maintain a desired valve needle lift upon activation of said actuator assembly.

Bosch argues that "[h]ad the inventors intended to claim a passage through which fuel could flow in either direction, they would have done so by claiming, for example, a fluid passage *between* the interior and combustion chambers." Dkt. No. 105 at 10.

The possibility of using "between" as an alternative formulation, however, does not warrant an overly narrow reading of the patentee's usage of "from . . . to . . . ."

Bosch cites *Bicon v. Straumann* for the proposition that "[n]ot only would [reading out limitations] be contrary to the principle that claim language should not [be] treated as meaningless, but it would be contrary to the specification, which describes the features of the [discarded claim language] in detail, not only in the description of the preferred embodiments, but in the background and summary of the invention portions of the specification as well." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 951 (Fed. Cir. 2006). At the April 25, 2025 hearing, Bosch also cited disclosure in the specification regarding "flow of fuel." '829 Patent at 13:5–20.

The applicable principle, however, is that "persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Phillips*, 415 F.3d at 1323. Although the claim recites "providing a fluid passage *from* said interior

chamber *to* said combustion chamber," Westport's analogy is apt. *See* Dkt. No. 115 at 4. If a walkway is said to be "from a parking garage to a building," this does not imply that people can walk in only one direction, forever unable to return to their vehicles. The claim limitation here at issue recites structure, not action. Bosch's proposal would improperly limit the disputed term to specific features of disclosed embodiments and should therefore be rejected.

The opinions of Bosch's expert regarding directionality are likewise unpersuasive. *See* Dkt. No. 105, Ex. A, Feb. 1, 2024 Quinlan Decl. ¶ 120 ("The only embodiments in the '829 Patent disclose a directly actuated injection valve, where the fuel flows from the interior chamber to the combustion chamber. There is no disclosure of fuel flowing in the opposite direction (i.e., from the combustion chamber to the interior chamber)."); *see also id.* at ¶¶ 116–124. Also of note, the specification discloses that, in some embodiments, some percentage of a fuel flow could be directed in such a way as to provide cooling for the injector (rather than being injected into a combustion chamber). *See* '829 Patent at 13:21–28.

Finally, although other claim language refers to "fuel," the term here at issue recites "fluid." To the extent the surrounding claim language requires "fuel," that language is limiting where recited and should not be included in the construction for the "fluid passage" term.

The Court therefore hereby construes "fluid passage from said interior chamber to said combustion chamber" to mean **"a passage fluidly connecting the interior chamber and the combustion chamber."**

## V. CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patent-in-suit. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain

from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 28th day of April, 2025.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE